THE PEOPLE, *ex relatione* Taylor and others, *vs.* THOMPSON and others.

Where to an *information in the nature of a quo warranto* filed against *individuals*, calling upon them to show cause by what warrant they exercise the *franchise* of maintaining a bridge across a navigable river and exacting *toll* from passengers, the defendants answer that they do so by virtue of an act of the legislature, authorizing the erection of a bridge in a specific form, and that they have in all respects conformed to the requirements of the act granting the franchise, upon which allegation issue is taken and found against them by the jury, *judgment of ouster* follows of course.

The court will not in such case deem the verdict *imperfect*, and refuse to render judgment, because the jury have not found that the *variation* or

*departure* from the requirements of the statute was in a point *material*, or that it was the *wanton act* of the grantees, or that it was *productive of injury to the public*. If *any excuse* existed proper for the consideration of the jury or of the court, which might have produced a favorable result to the defendants, *it was held*, it should have been alleged by way of pleading, and placed upon the record, so that the court might have passed upon its sufficiency ; but where the defendants placed their defence, as in this case, upon *a strict compliance* with the requirements of the statute creating the franchise, and there was no exception taken as to the rejection of evidence or as to the charge of the judge, the court refused to make any intendments in favor of the defendants.

*It was further held*, that this was not a *private franchise*, but was a franchise of a *public nature*, in which the public at large had an interest, and that an information in the nature of a *quo warranto* might be filed in the name of the people on the relation of any aggrieved citizen ; that in a case of this kind a *quo warranto*, or information in the nature of a *quo warranto*, was the appropriate remedy, and that it was not taken away by the fact that a *bond* had been executed as security for the faithful performance of the *conditions* upon which the grant was made ; such bond being merely cumulative.

*It was further held*, although the bridge was built in conformity to the requirements of the act granting the franchise, and so continued for the space of twenty-nine years, still it appearing that for *ten years* subsequent to such time, the grantees had failed to comply with such requirements— that the conditions prescribed were *continuing conditions*, that the non-compliance with them was a *misuser*, and that the defendants had incurred a forfeiture of the franchise.

INFORMATION in the nature of a *quo warranto*. The attorney general in October term, 1835, filed an information charging the defendants with claiming, using and exercising without any lawful warrant, grant or charter, the *liberties*, *privileges* and *franchises* of having and maintaining a *bridge* over and across *Harlaem river*, from the city and county of New York to the town of Westchester, in the county of Westchester, the Harlaem river being a public navigable river, in which the tide ebbs and flows ; and of asking, demanding and taking certain *tolls* and duties of and from all persons crossing, passing over, or using the said bridge. To which the defendants *pleaded* that by the act of the legislature of this state, passed 31st March, 1790, *Lewis Morris* and his heirs or *assigns* were authorized to build a bridge from Harlaem across Harlaem river to Morrissania, and that by such act it was directed that the bridge should not be less than *thirty feet in width*, and that between the cen-

NEW YORK, MAY, 1839.

237

The People v. Thompson.

tre arches thereof there should be *an opening not less than twenty-five feet*, over which there should be *a draw* not less than twelve feet, for the free passage of vessels; and that by the act Lewis Morris and his heirs or assigns were authorized for and during the term of sixty years, to ask, demand and take for the use of the bridge, a *toll* not exceeding the following rates, to wit, (setting forth the tariff of tolls as established by the act.) The defendant then alleged that by another act of the legislature, passed 24th March, 1795, the width of the bridge was required to be *only twenty-four feet;* that on the 8th October, 1796, *John B. Coles* became the *assignee* of *Lewis Morris,* and became vested with all and singular the rights of Morris in respect to the building of the bridge, and the having and enjoying the privileges, &c., granted by the act of 31st March, 1790 ; that previous to the 30th March, 1797, to wit, on the 1st November, 1796, Coles at his own expense built a bridge from *Harlaem* across Harlaem river to Morrissania, the *width* of which was and ever since hath been, and still is *not less than twenty-four feet,* and *between the centre arches* thereof there was and ever since hath been, and still is *an opening not less than twenty-five feet,* over which there was and ever since has been, and still is *a draw not less than twelve feet,* for the free passage of vessels: upon this last allegation as to the building of the bridge and the *dimensions* thereof in its several parts, its *width,* the *opening* between the centre arches, and the size of the *draw,* the attorney general, in one of his replications, took issue, (which issue is designated as the *second issue* in the finding of the jury, hereinafter mentioned.) The defendants also averred, that on the 1st July, 1804, Coles transferred and conveyed divers *shares and portions* of his right, &c., in and to the said bridge, and the liberties, privileges and franchises thereof to divers persons, and that they the defendants now severally own in their own rights respectively certain of the said shares or portions; the said term of *sixty years* not yet having expired ; and that the bridge since its erection has been kept and maintained, and still is kept and maintained by the said Coles and his assigns, at his and their own expense, in good and sufficient repair.

The People v. Thompson.

There were various other facts pleaded besides those above stated, and a variety of issues, both of law and fact, joined, which with one exception it is not deemed necessary here to particularize. That exception is the following: The attorney general in his replication set forth, in *hæc verba*, the act of 24th March, 1795, pleaded by the defendants for the purpose of showing that the width of the bridge might be reduced to *twenty-four feet.* This act commences by reciting, that by the act of 31st March, 1790, Lewis Morris was authorized to build a bridge across the Harlaem river, and for the term of sixty years to take tolls, at certain rates ; that Morris had assigned his right to build the bridge, and that proposals had been made by *John B. Coles* to the assignees of Morris to raise a *dam of stone* for the purpose of erecting mills thereon, and to be the *foundation of the bridge aforesaid.* It then *enacts*, among other things, that John B. Coles may erect such *dam*, and may make and keep in repair *a lock of the width of eight feet*, providing a sufficient person to attend the same to prevent delay in passing the lock with vessels, and imposing a *penalty of ten pounds* for not keeping the lock in repair, or for not furnishing sufficient attendance thereat. It enacts that the *width of the bridge* to be erected shall not be less than *twenty-four feet ;* and it requires that John B. Coles shall give security to the treasurer of the state in the penal sum of £4000, conditioned that he or his assigns will erect and *complete* the bridge within four years from the passage of the act, and that he or his assigns will keep the same *in good repair* during the term of sixty years. After setting forth this act, the attorney general, by way of *replication*, averred that neither Coles or his heirs or assigns had at any time since the passage of the act given such security. Upon which the defendants took issue.

The cause was tried upon the *issues of fact* joined, and a verdict found against the defendants. Whereupon the cause was brought before the court *in bank*, upon the *circuit roll* and the *minutes of the clerk of the circuit*, and the attorney general moved for judgment of ouster. The *minutes of the clerk of the circuit* conclude in these words:

The People v. Thompson.

" The jury, as to all the issues except the *second*, find for the defendants ; and *as to the second (issue,)* they find that said *bridge was built originally in conformity with the requisitions of the statute,* but said jury find *that at all times since the year* 1825, *until the commencement of this suit, there was not an opening between the centre arches of said bridge of the width of twenty-five feet,* as is alleged in the plea of the said defendants, but that at all times since the year 1825, to the commencement of this suit, *said opening was of less width than twenty-five feet ;* and as to all the other matters embraced in said second issue, except as to the width of said opening, said jury find for the defendants."

*S. Beardsley,* (attorney general,) for the people, contended that the verdict was in *form* sufficient. That a jury cannot be compelled to answer the whole of any issue embracing several particulars; they have a right to find a *special verdict,* and have done so in this case, answering to all the questions in dispute upon the *second issue* joined between the parties. The matter of the verdict was distinctly in issue : the defendants alleged not only *that the bridge was built* of certain dimensions, but that it *continued* in the state in which it was built. The verdict finds that the *opening* between the centre arches of the width required by the act had not existed since 1825, that is, that the diminution was owing to the state of the structure, and not that it was occasioned by a mere accidental or extraneous cause. It is a finding under the charge of the judge as to the legal import of the issue and of the evidence requisite to support it. The charge must be presumed to have been correct ; neither party having excepted to it. If a mere obstruction, not forming part of the bridge, and permitted to exist, were sufficient to contradict the plea, the finding embraces it— the jury say the opening was not twenty-five feet ; but it was contended by the defendants, and charged by the judge, that the opening was to be measured according to the parts of the structure, that is, the diminution must be by something forming part of the bridge, and that a diminution by

any thing not part of the bridge, was not sufficient to contradict the plea. The verdict has negatived the fact that the diminution was caused by a mere temporary obstruction or nuisance; it imports that it was owing to the state of the structure, and that such diminution had existed since 1825 until suit brought. The verdict also imports that the diminution was *material*, if its *materiality* be a proper subject of inquiry when the statute has fixed the *minimum*, declaring that there shall be an opening between the arches of *not less than twenty-five feet*. This, it is contended, *prima facie* settles the question. The statute having fixed the *minimum*, the smallest deviation is material, and should be so considered by the courts. If a legislative minimum may be disregarded, so may a judicial minimum; and what is now adjudged to be immaterial, may hereafter be extended by other tribunals, until at length no opening whatever between the arches will be required. Should it, however, be held that the jury were authorized to disregard an *immaterial deviation*, then the legal presumption is that they were so instructed by the judge. In fact, he did so charge as to the width of the *draw*, which was slightly less than twelve feet. The diminution of the opening was *six feet*. In short, the verdict finds a violation of the act, under which the defendants claim, in a point *material*, and a continuance thereof for ten years. No *excuse* exists for this non-compliance with the act, and none is pretended. Had the bridge been destroyed by a tempest, and the defendants had proceeded to rebuild it with reasonable diligence, and it had not been completed when the information was filed, such fact could and would have been pleaded. So, if by any other natural cause beyond the prevention of man, the piers of the arches had slipped and approached each other so as to diminish the required opening, it might have been pleaded; but nothing of the kind is pretended. The case presents a clear inexcusable violation of the act, and the defendants have forfeited their franchise.

The counsel further insisted, that by diminishing the width of the opening between the centre arches, contrary to the *minimum* limit, and express interdiction of the statute

The People v. Thompson.

creating the franchises, the defendants have forfeited them by *misuser* and breach of condition in law. The franchise to build a bridge over a navigable river and to *take toll* for passing over the same is granted upon public consideration and for public benefit. It therefore imposes a *charge* upon the grantee, the performance of which is an *implied condition* of his grant. Comyn's Dig. tit. Toll C. *Lord Pelham* v. *Pickersgill*, 1 T. R. 666. *Warrington* v. *Mosely*, 4 Mod. 319. The defendants in this case, to uphold their defence or title, must deny that this franchise is subject to a *condition concurrent and continuing*, that it shall conform to the requirements which the legislature have seen proper to impose for the public benefit. The franchise was granted in derogation of public right. The language of the act is explicit, that authority is given only to build a bridge of a certain specified description. Unless a bridge is built in conformity to the original act, or the act amending that first passed on the subject, no right to take toll or to maintain the bridge is given. The building of the bridge according to the requirements of the statute was clearly an implied condition, and had it been built originally, in the state in which it has been since 1825, the franchise of maintaining it and taking toll, would never have vested. Did the *condition* that the bridge should conform to the statute terminate with its original erection? All franchises founded on promoting public convenience, or infringing upon public right, are subject to the *implied condition* that they shall be used, and used in conformity to the terms of the grant by which they are created; and *nonuser* or *misuser* are grounds of forfeiture, Angel & Ames on Corp. 510, and cases there cited; per *Lord Holt*, in *City of London* v. *Van Acre*, 271; "for all franchises are granted on condition that they shall be only executed according to the grant, and if they *neglect to perform the terms*, the patents may be repealed by *sci. fa.*" This was said in relation to acts *long subsequent* to the creation of the franchise. See 1 Ld. Raym. 499, S. C. In the same case, Lord *Holt* says, that the fact that the party is subject to *indictment* will not prevent the *forfeiture* of the franchise. See also

Comyn's Dig. tit. Franchise, G. 3; tit. Condition, 'R.; tit Liberties, C., and 2 Inst. 219, 220. Indeed the idea of a *continuing condition*, is inseparable from that of a franchise granted upon condition of public service. The protection of the public, upon which is founded the implication of a condition originally, equally requires the implying of a continuing condition. The position that you may obtain a franchise of this kind by complying with the requirements of the law when you build the bridge, and may claim the right to use such franchise, although you *alter* the bridge the next day, is not warranted by any legal principle. The duty to build a bridge of a certain description, implies an obligation that it shall continue in the form in which it is built, so far as the act of man can ensure it. Such is the only construction that can be put upon the act granting the franchise, and such manifestly was the understanding of it by the counsel of the defendants when they interposed their pleas. They aver not only that the bridge was built in conformity to the requirements of the act, but that the *width between the centre arches was, ever since hath been, and still is* not less than twenty-four feet; thus fully admitting that the franchise was subject to a continuing condition, concurrent with the benefits to be enjoyed, and carrying the latter away with a breach of the condition. It is not to be said that the *misuser* to forfeit a franchise, can only be in that which disqualifies the subject of the franchise from answering its direct object; as if this bridge had been left in an impassible state. That would be in the nature of a *nonuser*. A misuser *ex vi termini*, implies using or abusing the franchise, so as to create some injury without its direct scope and purpose, as in this case. Here, although a bridge sufficient perhaps for the accommodation of those passing *over it* was maintained, the passage *under it* was not kept open according to the requirements of the act, by which *the right of navigation* was interfered with, contrary to the provisions of the statute for the protection of the public in that behalf. Under the pleadings in the case, the attorney general was not at liberty to show an interruption to the navigation by means of the diminution in the opening between the arches.

The People v. Thompson.

of the bridge, and nothing, therefore, is to be inferred from
the absence of proof on the subject. Whatever the extent
of the rule of law may be, as to *what misuser* shall create a
forfeiture in acts done by the holders of a franchise in its
use *contrary to the general laws of the state*, it may be safe-
ly assumed that when the franchise is used *contrary to the
very terms of the statute* creating it, transgressing what is
clearly forbidden, such is a fatal misuser. If any condition
is implied in the grant of a franchise, it must at least be,
that the requirements of the grant itself shall not be openly
and palpably for a succession of years violated, and that with-
out necessity, excuse or apology. It is no answer to say that
the parties may be proceeded against by *indictment*, if the
bridge *is not continued* in the form in which it was origi-
nally erected; because the same answer might be made if a
*forfeiture* was sought for its original construction in a form
different from that prescribed. If it be argued that the rule
contended for, of a *continuing condition*, will operate harshly,
and be of difficult application in determining what extent of
deviation shall work a forfeiture, it is answered that the
courts have nothing to do with the harshness or difficulty of
a rule of law. The parties can always guard against its ap-
plication by performing their obligations; and should it hap-
pen that meritorious holders of a franchise should be ousted
by a rigid rule of law, the people having resumed the fran-
chise, the legislature would re-grant it, if required by the
principles of equity and justice.

*G. Griffin* for the defendants, insisted, that it was at least
doubtful, whether in this state, a *quo warranto* lies to take
away from an individual, a *private franchise*, once lawfully
vested in him, on the ground of subsequent *misuser*. Ac-
cording to the theory of the English law, as resting on the
*dicta* of elementary writers, and sometimes even of judges,
it does lie for such a purpose ; but even in England, the quo
warranto process has never been *practically applied* to such
a case. He next contended, that if such was the common
law of England, it had not been adopted here ; that the law of
*quo warranto*, with us rested entirely upon statutory provi-

sions, and that the various legislative enactments existing upon the subject, did not embrace *private franchises.* He argued that there were good reasons why they should not be subject to this process. If the doctrine on the other side was correct, a turnpike road partially out of repair, a plank of a toll bridge decayed, or a bar of a railroad track loose, would produce a *forfeiture* of the franchises granted to individuals, who, on the faith of the state, had invested large sums of money in enterprises, by which the public were greatly benefitted. The slightest transgression and however brief its continuance, would produce the effect, and nothing could prevent the consequence. There is no necessity for this ; the public may be secured against the misuser of private franchises, by remedies less severe, and more congenial to the spirit of our laws. The owners of turnpike roads, bridges and rail roads, if in fault, may be *indicted,* fined and imprisoned ; a *mandamus* may be issued, compelling the performance of the incumbent duty, as was done in *Rea* v. *Swan & Wye Rail Road Company,* 2 Bar. & Ald. 646, or a *private action* may be brought at the suit of an individual specially injured, and exemplary damages recovered. In *Rex* v. *Ogden and others,* 10 Barn. & Cres. 230, Bayley, J. says, " There is no instance of a quo warranto information having been granted by leave of the court, against persons assuming a franchise of a mere private nature, not connected with the public government." This proposition seems to be sustained by the cases of *Rea* v. *Thatcher,* 1 Dowl. & Ry. 426, and *Rea* v. *Justices of Herefordshire,* 1 Chit. 709 ; see also *The People* v. *Hillsdale and Chatham Turnpike Company,* 2 Johns. R. 190 ; and goes beyond what is deemed necessary to contend for on the part of the defendants.

The counsel next insisted that *the people* having exacted and received *a bond with surety* for the building and keeping in repair of the bridge, should look to that remedy and not ask for a *forfeiture* of the franchise. A forfeiture for misuser is not prescribed in the statute creating the franchise ; if it exists, it arises by implication of law. The doctrine on the other side is that all franchises are granted on the *implied condition* that they shall be duly executed ac-

The People v. Thompson.

cording to the grant, and on failure to perform, the franchise shall be forfeited; but the law will not raise such implication where the penalty is provided for by express stipulation. It is a settled rule, that " an express covenant will do away the effect of all implied covenants." 2 Caines, 192; 11 Johns. R. 122. In support of this proposition, the counsel cited the case of the *Commonwealth* v. *Breed*, 4 Pick. 460, which was an information in the nature of a *qno warranto*, requiring the defendant to show by what title he claimed a certain bridge. The statute which authorized him to build the bridge, required that he should construct a *draw* for the passage of vessels, and on the approach of vessels, remove the same at his own expense; and in case of any undue detention, he should forfeit a sum not less than *three dollars*. The jury found specially, and from their finding, it would seem that the removal of the draw had not in general been well attended to. The court in giving their opinion say, " The penalty for any unnecessary delay in raising the draw, is fixed by the statute; and any neglect of this kind would subject the owner to this penalty, but would not operate as a forfeiture of the franchise."

The counsel next insisted that under the act of 24th March, 1795, John B. Coles was justified *in reducing the opening between the centre arches, to a width less than twenty-five feet.* This act authorized the *width of the bridge* to be reduced to 24 feet, and the *opening for the passage of boats* to be reduced to *eight feet*. If it be objected that this reduction was allowed only on the condition that a *stone dam* was erected, it is answered, that when this case was before this court on *demurrer,* it was held by the judges, that the leave to *reduce the width of the bridge* was unconditional; that the provision relative to the stone dam and lock was a *privilege* given to Coles, and not a *duty* imposed upon him, and that it was optional with him to avail himself of that privilege or not, as his interest might dictate. The reasoning of the court on that occasion overrules the objection now made on the other side. If Coles had an unqualified leave to reduce the *width of the bridge,* he had also an unqualified leave to reduce the opening for the

passage of boats. Unless therefore the verdict finds not only, that there is a diminution, but that the extent of the diminution is such as to reduce the opening to *less than eight feet*, there is no foundation laid for a forfeiture.

The counsel next insisted that the verdict would not authorize judgment of ouster on the ground of the *defective finding of the jury*. The verdict, he said, does not state the *cause* of the diminution of the opening between the centre arches of the bridge; nor the *extent* of such diminution, nor whether *any injury* thereupon has resulted or is likely to result to the public, nor that the obstruction formed any part or parcel of the bridge. For aught that appears, the diminution may have been caused by the act of a stranger, or by the current of the river, or by an earthquake, and its extent may have been a foot, an inch, or the breadth of a hair. The counsel admitted the correctness of the rule as laid down in 4 Cowen, 118, in a note, that " Where several things are necessary to constitute a complete title in the defendant, the attorney general may take issue on each, and *if any one of the issues, on a fact material to the title,* be found against the defendant, there shall be judgment of ouster; but insisted that the issue found against the defendants here was *not on a fact material to their title.* Had the force of the tide or any other cause lessened the *width of the opening* in question to the extent of the smallest mathematical line, there would have been a *diminution* in the opening, and the jury under the pleadings in the case, which went far beyond what the case required, were bound to say so; but their finding in that respect is *immaterial*, and on an *immaterial finding*, the court will not pronounce judgment of ouster. The jury find a *diminution*, but do not say it is *material* to the issue, and the court are asked to supply the omission by *inference.* Now no rule of law is more inflexible than that in giving judgment on a *special verdict*, (and the attorney general in his opening argument avers this to be such ;) *the court can draw no inferences ;* they cannot intend a fact not expressly found by the verdict. The rule is especially applicable to *penal actions*, and this is emphatically a penal action, seeking as it does the forfeiture of a bridge,

worth probably $60,000. In a case of this kind all the intendments of the law are in favor of the defendants. It will intend, where the contrary does not appear, that the temporary obstruction, narrowing the opening between the centre arches of the bridge, was owing, not to the unlawful act of the defendants, but to some cause over which they had no control; that the diminution was of a slight and trivial nature, and not of so aggravated and heinous a character as to work a forfeiture; that the obstruction has been innoxious in its effects, and has not wrought injury or inconvenience to the public; that the obstruction did not form a part and parcel of the bridge, but that it was something adventitious, collateral and extraneous; and the intendment of the court in favor of the defendants will be strengthened by the consideration, that the obstruction, such as it was, remained for ten long years without eliciting any complaint. The counsel for the people put forth the proposition, that any reduction of the opening to less than twenty-five feet, *however trivial such reduction might be*, works a forfeiture of the franchise. The verdict finds a diminution, but not the extent thereof; it does not find a foot, an inch, or any degree of diminution beyond the most attenuated line that the imagination can portray, and the law can find nothing beyond it in the verdict. Can it be that this evanescent shade of diminution, in a thing collateral to the main subject, has wrought a forfeiture of the bridge? The argument of the counsel is founded on the assumed rule that every franchise is held *upon condition*, and in case of neglect by the grantee to perform the condition, the franchise may be repealed. This is a rule of the common law, and if it applies to the statutes under which the franchise here is held, it is by virtue of the force of the common law, as those statutes are wholly silent as to any forfeiture incident to the breach of any condition. It is therefore a condition *implied* by the common law. Now whenever the common law implies a condition, and especially where it attaches the penalty of forfeiture to the breach, it exacts only a substantial and reasonable performance. The common law is the fruitful mother of a large family of implied conditions, and she

deals towards them with a mother's hand and a mother's heart. She does not put on her magnifying glasses to detect some fractional, minute, and scarcely perceptible infringement of the latter; she imposes the penalty of forfeiture only where there has been a blameable, palpable and substantial violation of the spirit of the condition.

The *Attorney General*, in reply, remarked, that two of the principal grounds relied on in the argument on the other side, appear to have been suggested to the minds of counsel since the decision of the demurrers and the trial of the issues of fact in this cause. If a *quo warranto* would not lie in a case of this kind, and if recourse to the *bond with surety* given by John B. Coles was the *only remedy* existing for a *misuser* of the franchise, it is passing 'strange that those grounds of defence should not have been urged originally, instead of putting in voluminous pleas, to show a strict conformity with the terms of the act by which the franchise was granted, if the counsel had any confidence in them; and it was equally strange that the discovery, that an opening of *only eight feet* between the centre arches of the bridge is all that can be required, should not have been made until now. But to proceed to the reply: the counsel calls this a *private franchise.* It is not a private franchise. When a franchise confers only *individual privileges*, then it is *private*; but when it affects *public rights*, it is a *public franchise.* In cases of private privileges in the nature of a franchise, the *government* alone can interfere; but where public rights are trenched upon by a franchise, every citizen has an interest, and may become a *relator*, in the name of the people, on leave obtained from the court. That a *quo warranto* will not lie in the latter case, is not and cannot be argued with any show of reason; for if a *quo warranto* does not lie in such cases, then every franchise, though by the terms of the grant *conditional*, is in fact *unconditional*, although the holders of the franchise are guilty of the most palpable acts of misuser—there being no other mode of proceeding than by *quo warranto*, by which the persons holding the franchise can be tried. This remedy is part of the common law of the state, and was not originated by

The People v. Thompson.

statute; all the statutes treat it as an existing remedy, and only profess to regulate the practice in respect to it.

The process of *quo warranto* is a useful, necessary and indispensible process; nor is there any thing alarming in it. A mere accidental or trifling departure from the terms of the grant, if remedied as soon as discovered, does not create a forfeiture, and if properly pleaded, the law would so pronounce it; but how does that apply to a continued violation, as in this case, of ten years. Nor is there any force in the argument that the only remedy for a misuser was to prosecute the *bond* given by Mr. Coles. The bond is conditioned as well for the *erection* of the bridge as for the keeping of it *in repair* after its erection; and if the grounds assumed by the counsel for the defendants be correct, a *quo warranto* could not have been brought for *nonuser* had the bridge never been erected, or been erected in a manner entirely different from the requirements of the act. The permission to erect a *lock of the width of only eight feet,* given by the act of 1795, cannot help the defendant. That permission was given in case Mr. Coles erected a *stone dam;* such dam was never erected, and consequently the lock fell with it. The legislature may have supposed that the dam would have rendered the navigation of the river a still water navigation, which would have made an opening of twenty-four feet unnecessary, and therefore authorized a lock of only eight feet; but whatever may have been the views of the legislature, the dam not having been built, there was no pretence for reducing the *opening* to any number of feet less than twenty-four. As to the *sufficiency* of the verdict to enable the court to pronounce judgment, the counsel referred to his opening argument.

*By the Court,* NELSON, Ch. J. That the remedy here sought for the grievance complained of is the appropriate one, cannot be doubted in this court, after the cases already decided. 15 Johns. R. 358. 6 Cowen, 126, 211, 217. 5 Wendell, 211. 15 id. 113.

This is not a *private franchise,* coming within the reason of the rule which has influenced the English courts not to

interfere with it by writ of *quo warranto,* on the relation of a private party, 2 Ld. Raym. 1409; Strange, 637, *S. C.:* Cas. Temp. Hardw. 247; 15 Johns. R. 389; 4 Cowen, 104, note, and cases there cited; Willcock on Corp. 457, 459; but one of a *public nature,* in which the community at large are essentially interested. Our statute is broader than the statute of Ann, both as to the *officers* and *franchises,* in respect to which the remedy may be thus applied, 2 R. S. 582, § 28; 1 R. L. of 1813, p. 108, § 4; 9 Ann, ch. 20, § 4; and the writ has often been allowed in England in analogous cases, on the application of the crown officer or attorney general. *Rex* v. *Nichols and others,* 1 Strange, 299. *Rex* v. *Badcock and others,* 6 East, 359. *Rex* v. *Clarke,* 1 id. 43. And see Willcock on Corp. 454, 457. The cases in this court, above referred to, will also show that the remedy is equally as appropriate where the franchise has become forfeited by *nonuser* or *misuser,* as in the case of an original *usurpation.*

The above view may be considered an answer also to the second ground taken against judgment of ouster; namely, that a *private franchise* cannot be forfeited by this process, where the people have required a *bond* with surety, conditioned, that the subject of the grant be made, and maintained according to its terms; for I do not understand the learned counsel to put forth the position as tenable where the franchise is deemed a *public* one. Be this, however, as it may, I am satisfied it is not maintainable in either case. The bond is but a *cumulative security* to the public, that the conditions of the statute will be faithfully observed. There is nothing in its enactments negativing this well defined and clearly understood common law remedy, and as has been well remarked by the attorney general, if the position of the counsel be sound in respect to the claim of forfeiture for *misuser,* it must be equally so as to that arising from *nonuser,* the condition of personal security comprehending each. The consequence would be, that the exclusive privilege of erecting a bridge over the Harlaem river to Morrisania, whether the bridge be erected or not, might continue vested in Morris and his assigns for the sixty years, on their

submitting to a forfeiture of the penalty of the bond. It would require a very clear and distinct provision in the statute to justify the conclusion that such was the intent of the legislature. It should be remarked also, that the course of pleading by the defendants has in effect conceded to the people the ground now sought to be occupied by the counsel in both the points above noticed.

Equally unavailing is the attempt to prevent judgment of ouster, on the ground of authority, to reduce the *opening between the centre arches* to a width less than twenty-five feet under the act of 1795. Though the *width of the bridge* was reduced by that act from thirty to not less than twenty-four feet, its dimensions in every other respect are left as prescribed in the original grant by the act of 1790. If the stone foundation had been built according to the former statute, the lockage through need have been only eight feet in width ; but then, very particular provision was made to facilitate the passage of boats without unnecessary delay, and suitable penalties were prescribed in case of neglect. Neither Coles or his assignees, however, have availed themselves of the privileges of the act of 1795. The foundation, dam and lock have never been constructed. The defendants, therefore, can set up no rights under it. For this reason they have been forced to fall back upon the act of 1790, as their defence against the charge of usurpation ; and to maintain themselves, they must show, at least, a *substantial compliance* with its conditions. They cannot modify it by a statute, the provisions and privileges of which have long since been forfeited.

The only remaining position, and it may be said the only one in the case but what had been already virtually disposed of by the pleadings themselves, arises upon the form and effect of the verdict. It finds the bridge to have been originally built in conformity to the requisition of the statute ; but that since 1825, and until the commencement of this proceeding, there has not been an opening between the centre arches of the width of *twenty-five feet*, as alleged in the plea, and that during all this time the opening has been of less width than twenty-five feet. The grounds taken by the counsel for ·

the defendants, in respect to the verdict are, that for aught appearing to the contrary upon the face of the verdict, the variation from the statutory regulations may have been trifling ; it may have been occasioned by obstructions wholly disconnected with the construction of the bridge, or by third persons ; and that the verdict does not show that the public have by means thereof sustained, or are likely to sustain, any inconvenience. There are, 1 think, without regarding separately the grounds thus assumed, two conclusive answers to them : 1. The defendants held the affirmative, and were bound to maintain their plea of *title* generally to the franchise, either by the concession of the attorney general, by proof, or in some other way ; they must, therefore, necessarily show the width between the arches to be according to the requisition of the statute, or set up a *legal excuse* for any departure therefrom. If compelled to admit a substantial departure, they should have put the justification upon the record, and brought it before the court ; and in that way obtained their judgment directly upon it. After having put themselves upon the ground of exact and literal conformity, upon which issue has been taken, a most material one, and which issue is found against them, with what propriety can they come in and say, true we have not performed the condition of our grant as found by the jury, but, perhaps, we had a legal excuse for the neglect or omission ? Thus, litigating the charge of exercising the franchise without warrant upon one ground, and after having failed, calling upon the court to justify them upon another and distinct one, and that, too, founded altogether upon presumption.

But 2. Assuming *an excuse* for the diminution of the opening to be available under the pleadings, it being involved in the issue, and the subject of litigation on the trial, the verdict for the people, under the charge and direction of the court, necessarily negatives the existence of any excuse. No objection is taken to the ruling of the judge in respect to the evidence offered, or to his instructions to the jury ; we must assume, therefore, that the defendants have had the full benefit of any explanations or excuse in their

power to offer, within the issue, and had it been such as would have made out a justification in judgment of law, that the verdict would have been in their favor. If the judge excluded competent evidence in relation to the excuse, or misdirected the jury upon the point, or if the verdict be against the weight of the evidence, the defendants should have sought a correction in the usual way, by a *case* or *bill of exceptions*.

This is not a special verdict in the technical sense of the term, but a direct finding of the issue for the people. A special verdict presents a statement of the facts proved, referring the conclusion of law to the court, and concluding conditionally for the plaintiff or defendant, as the court may be of opinion upon the whole matter.

Without pursuing the inquiry further, I am of opinion that the plaintiffs are entitled to judgment of ouster. 2 R. S. 583, § 48.