FRANCIS LAVALLE

*v.*

NICHOLAS STROBEL.

1. CAHOKIA COMMONS—*constitutional provision.* Section 8 of article 8 of the constitution of 1818, securing to the inhabitants of villages, etc., grants of commons, and prohibiting the sale, leasing or division of the same, does not apply to the commons of the towns or villages of Cahokia or Prairie du Pont, but leaves them to be governed and controlled by the general laws regulating alienations and partitions, giving the General Assembly power to place them under the same prohibitions that were imposed on other towns or villages holding commons.

2. COMMON LAW—*in force in* 1787. The common law of England, of a general nature, and applicable to our condition, and all statutes in aid thereof to supply defects therein, with some exceptions prior to the year 1607, were in force in Illinois after the cession by Great Britain, such having been the law of Virginia prior to the cession by that State.

3. ORDINANCE OF 1787—*effect on wills and deeds.* The second section of the ordinance of 1787, preserving to the French and Canadian inhabitants of Vincennes and the Kaskaskias and neighboring villages, etc., their laws and customs then in force relative to the descent and conveyance of property, did not compel them to devise and convey property in accordance with their laws and customs, and wills and conveyances executed by them in accordance with the requirements of the act of 1787 and the common law are unquestionably valid.

4. PARTITION—*verbal, before passage of the Statute of Frauds.* Before the adoption of the Statute of Frauds, a partition of lands made by verbal agreement was binding, if followed by livery of seizin, and an agreement in writing to make partition had the same effect as an actual partition at law.

5. SAME—*of common lands by plat laying off the same into town lots.* Where persons having a common interest in lands, appointed agents with power to lay off, survey and plat a part of such lands into a town, and when thus platted, to divide the lots among the several claimants according to their respective interests, which was done, and each claimant's name was written upon the lot assigned to him, it was *held* that this was a valid partition, and that the plat when recorded passed the title in severalty to the persons whose names were so written upon the lots in the plat, as to the lot or lots upon which his or their names were affixed, and an act of Congress confirming the plat and distribution made was *held* to pass the legal title to the several distributees, if it was then in the Government.

6. SAME—*when conveyances presumed.* After acquiescence in a partition of lands for a great period of time without any question of its validity, it will be presumed, if necessary to sustain the same, that proper partition deeds were executed by the parties in interest.

7. ACKNOWLEDGMENT—*of plat of town in* 1825. The law in force in 1825, in relation to the laying out of a town and platting the same, prescribed no particular form for the acknowledgment of the plat. A statement therein that the parties acknowledged the within to be a true plat of the town, and that the names of the several persons which appear thereon are the names of the first claimants to the several lots to which the said persons' names are affixed, fully complies with the statute then in force.

8. LIMITATION—*twenty years' adverse possession.* Twenty years of actual possession of land, claiming title against all the world, forms a complete bar to a recovery in ejectment against the occupant.

9. SAME—*when in favor of tenant in common.* If a tenant in common disseizes his co-tenant, claiming the land as his own, and keeps him out, not

recognizing his rights, but denying them, the Statute of Limitations will run and bar a recovery, the same as if they were not tenants in common, and this whether the estate is a legal one in the tenants in common, or is held in trust for the use and benefit of such tenants.

APPEAL from the Circuit Court of St. Clair county; the Hon. WILLIAM H. SNYDER, Judge, presiding.

This was an action of ejectment by Francis Lavalle, supervisor of the village of Cahokia, against Nicholas Strobel, for lot 303 of the Cahokia commons, which lot embraces the entire plat of Illinois City, which consists of 964 lots of equal size, numbered from 1 to 964, its streets, avenues, alleys, public square, a Protestant and a Catholic graveyard, located in the town plat. By agreement the controversy was confined to lot 32 of Illinois City.

The plaintiff relied on section 5 of the act of Congress of March 3, 1791, (U. S. Statutes at Large, Vol. 1, p. 221.) It reads:

Sec. 5. *And be it further enacted,* That a tract of land, containing about five thousand four hundred acres, which for many years has been fenced and used by the inhabitants of Vincennes as a common, also a tract of land including the villages of Cohos and Prairie du Pont, and heretofore used by the inhabitants of said villages as a common, be and the same are hereby appropriated to the use of the inhabitants of Vincennes and of the said villages respectively, to be used by them as a common, until otherwise disposed of by law.

The plaintiff also introduced in evidence the American State papers relating to Public Lands, (Duff Green's edition,) and read the part thereof relating to the common fields, village lots and commons of Cahokia, viz: the report of the commissioners (Backus and Jones), as follows: (See Vol. II, p. 167.)

*Report on the commons and common field tract and town lots of the villages of Cahokia and Prairie du Pont.*

"A tract of four leagues of land square," as expressed in the grant, on the 22d day of June, 1722, was granted to the mis-

sionaries of Cahokia and Tamarois, who seem to have been under the control of the Bishop of Quebec, by Pierre Duguet de Boisbriant, first Lieutenant of the King of France for the province of Louisiana, and commandant in the Illinois, and Marc Antoine de la Loire Des Ursins, principal commissary of the royal company of the Indies; (see United States Register, Book of Translations, p. 208,) bounded on the west by the Mississippi, including the adjacent islands, beginning " a quarter of a league above the little river of Cahokia," and extending south and east for quantity.

This grant was in fee simple, and from it have emanated the titles to the lands which form the subject of this report.

In respect to the commons, the report stated: By the fifth section of the law of the Congress of 1791, it is provided, that " a tract of land including the villages of Cahokia and Prairie du Pont, and heretofore used by the inhabitants of the said villages as a common, be and the same is hereby appropriated to the use of the inhabitants of the said villages respectively, as a common."

As the limits of the said commons were left by the said law undefined, and could not be found described in the ancient records, it became a subject of compromise and agreement between the citizens of the said villages and the acting Governor of the territory, about the year 1797; and by their consent two tracts, containing, in the whole, five thousand four hundred acres, ordered to be laid off for this purpose, were surveyed accordingly by a surveyor appointed by Governor St. Clair.

But on an examination into this business, the commissioners have discovered that the said surveys have been inaccurately and improperly made, that for Cahokia in particular, containing (instead of about four thousand acres, as it ought to have contained) about twenty thousand acres. This circumstance, and the situation of the said tracts not accommodating the inhabitants, this board have thought proper, at their request, to permit a new location to be made for each of the said villages, on lands more conveniently situated for them. The

limits and position of that part which has been re-located, will be found described in the annexed plats.

We have the more readily done this as the land which the inhabitants abandon is of more value to the United States than that which they have taken.

As to the Common Field, the report states: This tract, as will be seen by the plat and list of claims annexed, is composed of the various grants or allotments made to the several inhabitants of these villages, and from the first has been inclosed by a common fence.

The original boundaries of this tract have been found by the present surveyor, and there seems to be no dispute between the individuals claiming here, about their titles or their boundaries.

In respect to Town Lots: These are similarly situated with the common field lands. We do, therefore, declare that the United States have no interest in the lands here reported on, and affirm to the said several claimants in possession, the said lands, leaving it to those who may be injured by any error which may possibly have been committed in the premises, to pursue their remedy in a court of law.

To this report was appended the following note:

As special confirmations have heretofore been made, inconsistent with the descriptions in the annexed plat of Cahokia common field, we think it here necessary to remark that none of the allotments in the said field extended toward the Mississippi, over the rigolet or river L'Abbe, (so called;) and that it ought to be declared, by law, that any confirmations made, giving a greater extension to the said settlements toward the Mississippi, shall be null and void.

Commissioner's office, Kaskaskia, December 31, 1809.     MICHAEL JONES.
                                                        E. BACKUS.

The plaintiff also gave in evidence a plat of United States survey No. 777 as one of the tracts of land referred to in that report, " On the commons." This survey contains one thousand eight hundred and ninety-eight acres, and upon a part of it " Illinois City " was laid out.

Also section 3 of the act of Congress, of February 20, 1812, (U. S. Statutes at Large, Vol. II, p. 678.)    It reads:

Sec. 3.    *And be it further enacted,* That the decisions made by the commissioners heretofore appointed for the purpose of examining the claims of persons to lands in the district of Kaskaskia in favor of such claimants to town or village lots, out lots, or rights in common to common and common fields, as entered in the transcripts of decisions, bearing date the 31st day of December, 1809, which have been transmitted by the said commissioners to the Secretary of the Treasury according to law, be confirmed to all such rightful claimants according to their respective rights thereto :    *Provided,* that nothing herein contained shall be construed to confirm any particular decision heretofore made in favor of any individual, or to affect the right of any other individual claiming the same land; but such conflicting claims shall be decided according to law by the proper tribunal.

The plaintiff also gave in evidence the plat of Illinois City. This plat was recorded in the recorder's office of St. Clair county, in book E, pp. 301–2, on July 27, 1825.

The certificate attached to and recorded with this plat, reads as follows :

STATE OF ILLINOIS, *St. Clair County—ss.*

Be it remembered, that on the 2d day of July, A. D. 1825, personally appeared before me, the subscriber, an acting justice of the peace of the said county of St. Clair, John Hay, John Hays and Francis Turcotte, three of the commissioners appointed by an act of Congress, passed the first of May, A. D. 1820, entitled "An act confirming the proceedings of the inhabitants of the village of Cahokia, in the State of Illinois, in laying out a town on the commons of said village," who acknowledged the within to be a true plat of said town, and that the names of the several persons who appear thereon are the names of the first claimants to the several lots to which the said persons' names are affixed.

Acknowledged before and certified by

JOSEPH TROTIER, J. P.  [seal.]

Four of the lots are inscribed " Catholic graveyard," four others with " English graveyard," two others with " Catholic church," two others with " English church," one other as the " public schools," and all the rest, but a few, with the names of persons as inhabitants, and all the heads of families of Cahokia at the time of the original platting and distribution of. the lots in " Illinois City " among the ancient inhabitants of Cahokia.

" Lot 32 " is inscribed with " Jarrot."

The plaintiff finally gave in evidence the act of 1867, Private Laws Illinois, 1869, Vol. 4, p. 252, as authorizing the supervisor to bring suit, etc.

This act also declares that the act of January 24, 1827, and the acts amendatory thereto, were intended and meant to enable said supervisor to sue in his own name as supervisor, in all actions concerning the rights and titles of, and injuries committed to said commons.

The other material facts appear in the opinion of the court.

Mr. M. MILLARD, for the appellant.

Messrs. BOWMAN & HALBERT, for the appellee.

Mr. JUSTICE WALKER delivered the opinion of the Court:

There was a village on a portion of the Cahokia commons, on the 18th day of September, 1817, and residing therein about fifty families. Some fifty-two of the male residents of the place, on that date, executed a power of attorney to Nicholas Jarrot, Jesse B. Thomas, John Hay, John Hays and Francis Turcotte, to lay out a town on a part of the common east of the village of Cahokia, and to make a plat of the same ; and to petition Congress to grant the " fee simple right" to so much of the commons as would embrace the town thus laid out; and to distribute among them their several shares as these commissioners might think fit and proper. And also to sell such portions, and convey the same in fee, as might

be necessary to defray the expenses; and in the absence or death of one or two of the attorneys, the others were empowered to execute and carry out the power thus conferred.

This power of attorney was acknowledged before a justice of the peace of the county, and the county clerk certified to his official capacity. The power was duly recorded on the 26th of September, 1817.

The persons named in the power of attorney proceeded to lay off and plat the town, and named it "Illinois City." They laid off and designated on the plat a public square, an English and a Catholic graveyard, and a Catholic and an English church, and a public school on the grounds they were to occupy. The plat was acknowledged by three of the attorneys before a justice of the peace of the county, on the 2d day of July, 1825, and was recorded on the 27th day of that month. On this plat was marked the name of each person to whom the lot or lots were awarded. Appellee traced title by conveyances, from the persons whose names were written on the lots in the plat as owners, to himself, and proved that he had been in the full and peaceable possession of the lots, continuously, for more than twenty years.

It appears that after the survey and plat were made, and before the plat was acknowledged, the persons signing the power of attorney, in the month of January, 1819, presented a petition to Congress, reciting that they had caused to be laid off into town lots a portion of Cahokia common, and stating the manner in which it was done. They pray that Congress may grant and confirm to them the fee simple estate of the town thus laid off, to the same extent as contained in the plat of the town, and that one or more commissioners be appointed to convey to each inhabitant his portion as aforesaid of the town lots, and to convey such lots as might be sold to defray the expenses of the survey, platting, etc.

The committee on public lands reported a bill, and referred to and recited the steps that had been taken in laying off the town and the division of the lots amongst the citizens accord-

ing to their respective interests therein. And it seems that in pursuance to the petition, Congress passed this act :

*Be it enacted, etc.,* That the proceedings of the inhabitants of the village of Cahokia, in the State of Illinois, by their agents, Jesse B. Thomas, John Hay, John Hays, Nicholas Jarrot and Francis Turcotte, in laying out a town called "Illinois City," on one of the tracts of land confirmed to them as a common by an act of Congress, passed on February 20, 1812, and the distribution made by the said agents of the lots amongst the inhabitants of said village of Cahokia, be and the same are hereby confirmed.

Sec. 2. *And be it further enacted,* That the said Jesse B. Thomas, John Hay, John Hays, Nicholas Jarrot and Francis Turcotte, or any three of them, be and they are hereby authorized to convey by deed, in fee simple, the lots that have heretofore been distributed as aforesaid to those persons or their legal representatives to whom distribution as aforesaid was made.

It is said these lands or commons were granted by the French government to the inhabitants first settling Cahokia, and that their title thereto was recognized and secured to them by the treaty of cession from that government to the government of Great Britain, and by the latter, by a like treaty with the government of the United States, and if not, then the act of Congress of 1812 granted these commons to the inhabitants of that village. After the grant, and the State government having been inaugurated, and Illinois having been admitted into the Union, that Congress had no further power to prescribe the manner in which these or any other lands not owned by the general government should be alienated, but that power was vested exclusively in the State government, and the act of Congress of May, 1820, was without power, and confirmed or conferred no rights on any person, but left them in common as before. It may be doubtful whether this act of Congress did partition the lands by adopting and confirming the town plat.

It is also contended that the 8th section of article 8 of the constitution of 1818 provides that such grants shall remain common to the inhabitants of the village, etc., to which the grant was made. The provision is this: "And all lands which have been granted as a common to the inhabitants of any town, · hamlet, village or corporation, by any person, body politic or corporate, or by any government having power to make such grant, shall forever remain to the inhabitants of such town, hamlet, village or corporation; and said commons shall not be leased, sold or divided under any pretense whatever: provided, however, that nothing in this section shall be so construed as to affect the commons of Cahokia or Prairie du Pont; provided, also, that the General Assembly shall have power and authority to grant the same privileges to the inhabitants of the said villages of Cahokia and Prairie du Pont as are hereby granted to the inhabitants of other towns, hamlets and villages."

It is manifest to our minds that this provision of the fundamental law excluded these two towns or villages from the operation of that section, and left them to be governed and controlled by the general laws regulating alienations and partitions, but at the same time empowered the General Assembly to place them under the same prohibitions that were imposed upon other towns or villages holding commons. The obscurity, if there is any, in the second proviso of the section, grows out of the term privilege, when referring to the provisions relating to other towns and villages. Now, what were the privileges granted by that section to other towns, villages, etc.? The constitution had left all other persons and corporations holding lands as tenants in common, with power to lease, sell or divide the same, and the framers of the organic law, no doubt, regarded it a privilege to the inhabitants of such towns and villages to· have a perpetual prohibition placed upon their power, and on any other power to lease, sell or divide their commons, and being an exception from the general law on the subject, it was esteemed a privilege and not a restriction. These inhabitants being French in their origin or extraction,

and having acquired these commons, in accordance with the laws of their own country, no doubt esteemed it, and so did the framers of the constitution, as a great and valuable privilege to continue to hold them according to the laws and customs of their mother country and of their forefathers. This is, no doubt, the reason that term was used, as that was then its meaning.

With this construction the language of the section is harmonious, and is free from obscurity—otherwise it would be obscure, if not meaningless, and it was, no doubt, the knowledge of the strong predilection of these French inhabitants for their ancient usages and the customs and laws under which they had lived, that induced the convention to empower the General Assembly to restore them to the same condition under which that section had placed the other towns and villages, as to their commons. But the General Assembly has never adopted such an enactment, and hence Cahokia and Prairie du Pont have, ever since the State was organized, been free from the restriction imposed on the other towns and villages holding commons.

The common law of England, of a general nature, and applicable to our condition, and all statutes in aid thereof, and to supply defects therein, with some exceptions, prior to the year 1607, were in force in Illinois Territory after the cession by Great Britain, such having been the law of Virginia prior to the cession by that State. It is true that the second section of the ordinance of 1787 preserves to the French and Canadian inhabitants of Vincennes and the Kaskaskias and neighboring villages, etc., their laws and customs then in force relative to the descent and conveyance of property. It was whilst this law and the ordinance were in force that the proceeding to partition this property was inaugurated, and whether, under their laws and customs, they could make partition does not appear. But this ordinance did not compel them to devise and convey their property in accordance with their laws and customs, but it simply conferred upon them the privilege of

doing so if they chose. But wills and deeds of conveyance executed by them, in accordance with the requirements of the act of 1787, and the common law, were unquestionably valid.

But this partition was not completed, although commenced before, until after the State government was organized, the plat having been acknowledged and recorded in July, 1825. This, then, was completed after the ordinance of 1787 had been superseded by the State constitution, which had excluded Cahokia from the provision prohibiting such commons from ever being leased, sold or divided, and the inhabitants of that village were free to adopt any means the law authorized to be employed to make partition of this land owned and held by them in common.

The law then in force authorized tenants in common to make partition by bill in equity, by a proceeding under the statute (see Laws 1819, p. 385,) or by agreement by the owners themselves, and, until the adoption of the Statute of Frauds, a partition might be made by verbal agreement, and it was binding if followed by livery of seizin, and an agreement in writing to make partition will have the same effect as an actual partition at law. 2 Cruise Dig. 484. In this case there was a written agreement under seal to partition, and persons appointed to make partition.

The act of the 4th of January, 1825, which provides for the laying off, platting, and recording town plats, was in force when this plat was acknowledged and recorded. The second section (Sess. Laws, p. 54) provides, "that every donation or grant to the public or any individual or individuals, religious society or societies, or to any corporation or bodies politic, marked or noted as such on such plat, wherein any donation or grant may have been made, shall be considered, to all intents and purposes, as a general warranty against such donor or donors," to the donees or grantees, etc., for the purposes intended by the donors, grantors, etc., and the third section requires the plat to be acknowledged before a Justice of the Supreme Court, a judge of the circuit court or a

justice of the peace of the county, and to be recorded with the plat. This plat was acknowledged before a justice of the peace of St. Clair county, and the acknowledgment states that it was a true plat of the town, "and that the names of several persons who appear thereon are the names of the first claimants to the several lots to which the said persons' names are affixed." The act then in force prescribed no form for the acknowledgment, and the form adopted in this case we regard as fully complying with the statute.

The names of the persons written on the lots, designated on the plat, by necessary intendment, must be held to imply that such persons were severally donees or grantees of the lots thus marked. Marking lots, "Catholic graveyard," "English graveyard," "Catholic Church," "English Church" and "Public Schools," as was done on this plat, clearly implied a donation or grant for those several purposes. We presume no one would doubt that the plat, by its own operation, vested the title in the persons representing these churches, graveyards and schools, or, if there was no person to take, then in the donors for the use of these several bodies. Then why not the same presumption under the statute in favor of these several persons whose names are written in like manner on the plat of the lots? No reason is perceived. But if there could be any doubt, it is removed by the acknowledgment, as the agents of the owners, acting under a sufficient power, have removed all doubt, as they say that these names represent the first claimants of the several lots to which their names are affixed. There can be no doubt that these lots were thus allotted to the several persons thus named.

Here, then, we have the persons having a common interest in lands appointing agents and fully empowering them to lay off, survey and plat a portion of these lands into a town, and when thus platted, to divide the town lots among the several claimants according to their separate interests. This, their agents did, and instead of requiring all of the owners but one to join in conveying to him his portion, and in like manner

requiring a like deed to each owner, they adopted the simple mode of making the grant to each owner for his several portion operative through the plat they made and recorded. This operated as a partition made by the claimants, by their agents appointed and empowered to do so, and who acted for them, and the partition thus made was satisfactory and was considered as binding by the parties in interest, their heirs and grantees, for a half of a century.

After such an acquiescence for such a great period of time, we would, if necessary, be compelled to presume the necessary partition deeds were executed by the parties in interest.

If, on the contrary, the inhabitants of this village did not derive a fee to these commons by the grant from the French government, although the commissioners appointed by the general government report that a tract of four leagues square was granted in fee to the missionaries of Cahokia and Tamarois, on the 22d of June, 1722, by the first Lieutenant of the King of France and another acting with him. If this grant ever existed and was valid, it was to the missionaries, and not to the inhabitants of these settlements, and we have no evidence that this grant to the missionaries was ever confirmed or recognized by Congress. On the contrary, we find that body claiming the right of ownership to these lands by a special enactment, on the third of March, 1791, by which they appropriated these lands to the use of these villages, to be used by them until otherwise disposed of by law. It will be observed that this act only appropriates these lands to be used as a common until they should be disposed of by law. The act does not grant the fee, but simply the use of the lands in common to the inhabitants.

Commissioners appointed for the purpose made a report of a survey, etc., of these commons in 1809, and say that the common field lands, by the plat and list of claims annexed, are composed of the various grants or allotments made to the several inhabitants of the villages, and that there is no dispute between the individuals claiming, about their titles or bounda-

ries, and as to the town lots, they report they are similarly situated with the common fields. How similarly situated? By grants or allotments made to the several inhabitants of these villages. This was followed by the act of Congress of the 20th of February, 1812, confirming the claims of persons to town or village lots of all such rightful claimants, according to their respective rights thereto, but leaving individuals disputing the claims of others to have them decided according to law by the proper tribunal. Here, there is only a confirmation of rightful claims, but no language implying a grant of any new or additional right or title. If, then, the inhabitants were not the owners in fee, as tenants in common, and the title remained in the general government, the act of the 1st of May, 1820, by confirming the plat and distribution made by their agents, Jesse B. Thomas and others, undoubtedly transferred the fee to each person according to the distribution, as they authorize the agents or any three of them to convey the title in fee to the persons to whom the allotment had been made. This law, by its own terms, passed the fee, if it was then in the government, to the distributees of the lots. The act authorizes the commissioners, but does not require them, to make such conveyances. But if it did, this lot was conveyed by three of them to the heirs of Nicholas Jarrot, from whom appellee derives title, and all title which the government then held and possessed has passed to and is held by appellee.

Again, we, under the circumstances of this case, must hold that twenty years of actual possession, claiming title against all the world, forms a complete bar to a recovery.

In the case of *Doe ex dem. etc.* v. *Prosser,* 1 Cowper R. 217, it was held that upon a possession of thirty-six years by one tenant in common, not paying or accounting with his co-tenant for rents and profits or recognizing his rights to the premises, an ouster would be presumed, and that the occupant had held adversely, and that an entry was barred and a recovery could not be had in ejectment. The case of *Goewey* v. *Urig,* 18 Ill. 238, holds that where one tenant in common disseizes

other cotenants, and holds adversely, the statute will bar an action by his cotenants, and it was held, that the sale of the whole tract by one cotenant to a third person, the sale being followed by adverse possession, amounts to an ouster or disseizin of the cotenants, and the Statute of Limitations will bar their action or entry. It then follows, that where a tenant in common disseizes his cotenant, claiming the land as his own, and keeps him out, and not recognizing his rights, but denying them, the Statute of Limitations will run, and bar a recovery, as it would were they not tenants in common.

Here, appellee is shown to have occupied adversely to all persons, used and claimed the land as exclusively his own, and has never paid rents or accounted with any one for more than twenty years, and no reason is perceived why he may not invoke the rule announced in these cases to protect his rights and to bar a recovery. If the title to the land was held in common, it vested in the grantees, as tenants in common, and he may, especially under his chain of title, oust and disseize his other cotenants, and bar a recovery by them or by any person for them.

It is urged, that these grants have been repeatedly held by the courts to be vested in the villages and not the inhabitants. Concede this to be true, and still the grants were for the use of the inhabitants residing in these various villages. Not being incorporated or authorized to act as corporate bodies, it is difficult to see how they could take as villages. At all events, Congress manifestly intended these commons for the people, and not the villages as corporations. If the French government granted the fee to the missionaries, that was manifestly for the use of the inhabitants. So it does not matter whether the title was acquired from the French government or by grant from Congress, as, in either case, the title was granted for the use of the inhabitants.

This, then, if not at law, did in equity, give each inhabitant an equal common right or interest in these common fields, being a common right or interest in its nature like an

25—89 ILL.

estate held by tenants in common. Whatever the estate may have been which each claimant held, from its very nature it was such that after partition each person might enter into exclusive possession of the portion assigned to him, and by continuous exclusive possession he would disseize all others having a common or specific interest in the property, and by possession, claiming title for a sufficient time, an action by the village or any or either of its inhabitants would be barred by the Statute of Limitations, and this, whether the title was a tenancy in common, or a common interest not amounting to such an estate. In other words, the possession in this case, we think, was of such a character as barred a recovery, whatever the nature of the title or in whomsoever it may have been vested.

Perceiving no error in the record, the judgment of the court below must be affirmed.

*Judgment affirmed.*