*In re* SANDERSON.

1. JUSTICES OF THE PEACE—JUDICIAL POWER—DEFINITION.

"Judicial power," as that term is used in constitutional and statutory provisions relative to justices of the peace, is the power to hear and determine controversies between adverse parties and questions in litigation (Const. 1908, art. 7, §§ 1, 16; 3 Comp. Laws 1929, § 17426).

2. BAIL—JUDICIAL POWER.

The power to let to bail is not the exercise of judicial power.

3. BREACH OF THE PEACE—JUSTICES OF THE PEACE—JUDICIAL POWER.

The authority of a justice of the peace to compel one who has threatened to kill another to give security to keep the peace is entirely separate and distinct from the performance of ordinary judicial functions (Const. 1908, art. 7, §§ 1, 16, 18; 3 Comp. Laws 1929, § 17426).

4. JUSTICES OF THE PEACE—CONSERVATOR OF THE PEACE—JUDICIAL POWER.

The authority of a justice of the peace, acting as a conservator of the peace in pursuance of the constitutional and statutory provisions relative to such office, is entirely separate and distinct from the ordinary jurisdiction and power of a justice of the peace to hold court (Const. 1908, art. 7, §§ 1, 16, 18; 3 Comp. Laws 1929, §§ 17388, 17426).

5. BREACH OF THE PEACE—CONSERVATORS—JUSTICES.

A primary object of the creation of the offices of conservators and justices of the peace was to prevent breaches of the peace by putting persons under bonds for keeping the peace, or for their good behavior (Const. 1908, art. 7, §§ 1, 16, 18; 3 Comp. Laws 1929, §§ 17388, 17426).

6. SAME—FORFEITURE OF RECOGNIZANCE.

A breach of the peace committed after a person has given security against doing so forfeits the recognizance.

7. JUDGES—JUSTICES OF THE PEACE—NATURE OF OFFICE OF CON-
SERVATOR OF THE PEACE.

Under the Constitutional provision making judges and justices
conservators of the peace they hold such authority not as a
member of a court while in session but as an officer in that
special capacity who is no more judicial than executive officers
(Const. 1908, art. 7, § 18).

8. COMMON LAW—CUSTOM—GENERAL ENGLISH STATUTES.

The common law as brought to this country included not only
the common customary law of England but the law as modified
by English statutes of general operation.

9. SAME—ORDINANCE OF 1787—NORTHWEST TERRITORY—MICHIGAN
TERRITORY.

The ordinance of 1787, relating to the government of the ter-
ritory northwest of the Ohio river, provided that the inhab-
itants thereof should always be entitled to judicial proceedings
according to the course of the common law, which then included
English statutes of general application, and such continued to
be the law of Michigan during the territorial period (1 Terr.
Laws, pp. 133, 588; 2 Terr. Laws, pp. 459, 460; 3 Terr. Laws,
pp. 1142, 1144).

10. BREACH OF THE PEACE—FAILURE TO GIVE RECOGNIZANCE—COM-
MITMENT FOR NINE MONTHS BY JUSTICE OF THE PEACE.

Commitment of person to common jail for period of 9 months
or until he gave recognizance and paid costs, upon his failure
to give a recognizance in the sum of $500 to keep the peace
after having been found guilty of threatening to kill a man,
*held*, within jurisdiction of justice of the peace as conservator
of the peace in view of the common law and practice under
prior statutes (Const. 1908, art. 7, §§ 1, 16, 18; 3 Comp. Laws
1929, §§ 17388–17393, 17396, 17397).

11. SAME—STATUTES—CONSTITUTIONAL LAW—JUSTICES AS CONSERVA-
TORS OF THE PEACE.

Statute authorizing justice of the peace to cause laws made for
the preservation of the public peace to be kept and authorizing
him to require persons to give security to keep the peace *held*,
not unconstitutional in view of provision of Constitution desig-
nating justices of the peace as conservators of the peace (Const.
1908, §§ 7, 18; 3 Comp. Laws 1929, § 17388).

*Habeas corpus* by Edward Sanderson with accompanying certiorari to Albert H. Perkins, Justice of the Peace in and for the city of Lapeer, to obtain release from the county jail. Submitted April 4, 1939. (Calendar No. 40,516.) Writ denied June 5, 1939.

*Isabel L. Hannah,* for petitioner.

*Thomas C. Taylor,* Prosecuting Attorney, for the people.

POTTER, J. Harry Sterner complained before Albert H. Perkins, a justice of the peace of the city of Lapeer, that Edward Sanderson, of Imlay township, Lapeer county, threatened to kill him and that he was afraid Sanderson would carry that threat into execution. He prayed that Sanderson be required to find sufficient sureties to keep the peace towards complainant. A warrant was issued for Sanderson's arrest and he was later tried and found guilty before a justice of the peace and required to enter into a recognizance in the sum of $500 to keep the peace towards all the people of this State and especially towards the complainant for nine months, and to pay $14 costs. Sanderson failed to pay the costs or to give the recognizance required by the justice and was sentenced to the common jail of Lapeer county for nine months or until he entered into the required recognizance to keep the peace and paid $14 costs, or until he was discharged by due course of law..

Defendant petitioned for *habeas corpus* claiming his imprisonment was illegal in that the sentence was for a longer term than the justice of the peace had a right to impose and the time that plaintiff could be legally detained had already expired.

The complaint was made December 19, 1938. Defendant was tried December 20, 1938, found guilty

and required to enter into the recognizance and pay the costs, and in default thereof was sentenced December 20, 1938, to the common jail. Petition for writ of *habeas corpus* herein was filed March 21, 1939, and on the same day a writ of *habeas corpus* and an ancillary writ of certiorari were issued. Return to each of said writs has been made.

Petitioner contends the limit of the jurisdiction of a justice of the peace was to cause defendant's imprisonment for a period of three months, and that his sentence of defendant to be detained for a period of nine months or until he gave the recognizance in question and paid the costs was excessive and illegal, and that petitioner, having served three months, is being illegally detained and is entitled to be discharged. Plaintiff relies upon *Elliott* v. *People,* 13 Mich. 365; *People* v. *Harrington,* 75 Mich. 112; *In re Kenney,* 147 Mich. 678; *People* v. *Gilbert,* 163 Mich. 511 (Ann. Cas. 1912 A, 894).

Section 1, art. 7, Constitution of 1908, provides that "the judicial power shall be vested in one Supreme Court, circuit courts, probate courts, justices of the peace," et cetera.

Section 16, article 7, provides:

"In civil cases, justices of the peace shall have exclusive jurisdiction to the amount of one hundred dollars and concurrent jurisdiction to the amount of three hundred dollars, which may be increased to five hundred dollars, with such exceptions and restrictions as may be provided by law. They shall also have such criminal jurisdiction and perform such duties as shall be prescribed by law."

The statute enacted in pursuance of this constitutional provision provides:

"Any justice of the peace shall have power to hold a court subject to the provisions hereinafter con-

1939] <em>In re</em> SANDERSON. 169

tained, to hear and determine charges for all offenses arising within his county punishable by fine not exceeding one hundred dollars, or punishable by imprisonment in the county jail not exceeding three months, or punishable by both said fine and imprisonment." 3 Comp. Laws 1929, § 17426 (Stat. Ann. § 28.1192).

"By the judicial power," mentioned in the above-cited constitutional provisions and in the statute enacted in pursuance thereof, "is generally understood the power to hear and determine controversies between adverse parties, and questions in litigation." *Daniels* v. *People,* 6 Mich. 381. But the power to let to bail is not the exercise of judicial power. *Ex parte Gist,* 26 Ala. 156; *Cox* v. *Coleridge,* 1 B. & C. 37 (107 Eng. Rep. 15); *Daniels* v. *People, supra.*

The authority of a justice of the peace to compel one who has threatened to kill another to give security to keep the peace is entirely separate and distinct from the performance of ordinary judicial functions. The Constitution of this State provides that justices of the Supreme Court, circuit judges and justices of the peace shall be conservators of the peace within their respective jurisdictions. Constitution of 1908, art. 7, § 18.*

The power of a justice of the peace acting as a conservator of the peace in pursuance of the constitutional provision and statutes above quoted is something entirely separate and distinct from the ordinary jurisdiction and power of a justice of the peace to hold court. One of the primary objects of the creation of the offices of conservators and justices of the peace was to prevent breaches of the peace by putting persons under bonds for keeping the peace, or for their good behavior, which includes breach of the peace, and more. The breach of the peace threat-

---

* See 3 Comp. Laws 1929, § 17388 (Stat. Ann. § 28.1154).—REPORTER.

ened was the occasion for requiring such security. Any breach of the peace committed afterwards forfeited the recognizance. *Branch County Prosecuting Attorney* v. *Branch Circuit Judge,* 75 Mich. 488.

Our Constitution makes judges and justices conservators of the peace. Each person holds the authority, not as a member of a court while in session, but as an officer in that special capacity. Conservators of the peace appear to have been regarded as no more judicial than executive officers, and several of the high executive functionaries exercised their powers. *Daniels* v. *People, supra; Entick* v. *Carrington,* 19 Howell's State Trials, p. 1030.

Among the ordinances of Edgar (959–975), *Suplement,* cap. 3 provided:

"This, then, is what I will: that every man be under 'borh,' both within the 'burhs' and without the 'burhs;' and let witness be appointed to every 'burh' and to every hundred." Stubbs, Select Charters (8th Ed.), p. 72.

Cap. 5, *Secular Ordinances,* provided:

"And let the hundred gemot be attended as it was before fixed; and thrice in the year let a burh-gemot be held; and twice, a shire-gemot; and let there be present the bishop of the shire and the ealdorman, and there both expound as well the law of God as the secular law." Stubbs, Select Charters (8th Ed.), p. 71.

Cap. 6 provided:

"And let every man so order that he have a 'borh;' and let the 'borh' then bring and hold him to every justice; and if any one then do wrong and run away, let the 'borh' bear that which he ought to bear. But if it be a thief, and if he can get hold of him within twelve months, let him deliver him up to justice, and let be rendered unto him what he before had paid." Stubbs, Select Charters (8th Ed.), p. 71.

The ordinance of Ethelred (978–1016) provided:

"That is, that every freeman have a true 'borh,' that the 'borh' may present him to every justice, if he should be accused. But if he be 'tyhtbysig,' let him go to the threefold ordeal. If his lord say that he has failed neither in oath nor ordeal since the gemot was at Bromdun, let the lord take with him two true thegns within the hundred, and swear that never hath oath failed him, nor had he paid 'theofgyld;' unless he have the reeve who is competent to do that. If then the oath succeed, let the man then who is there accused choose whichever he will, either single ordeal, or a pound-worth oath, within the three hundreds, for above thirty pence. If they dare not take the oath, let him go to the triple ordeal. . . . And let every lord have his household in his own 'borh.' " Stubbs, Select Charters (8th Ed.), p. 72.

Among the *Secular Dooms* of Canute (1016–1035), cap. 20 provided:

"And we will that every free man be brought into a hundred and into a tithing. . . . And that every one be brought into a hundred and in 'borh;' and let the 'borh' hold and lead him to every plea." Stubbs, Select Charters (8th Ed.), p. 73.

"Its general feature is the provision for every person of some other persons who shall be borh or security that whatever moneys have to be paid will be forthcoming, and that if necessary the party can be produced in court." Plucknett, History of Common Law (1st Ed.), p. 91.

"Cnut required his subjects to be in tithing and in borh as well, and regular means were established for ascertaining that every person (who was not of some substance) was duly enrolled in tithing and in borh. This machinery was operated by the sheriff through the hundred court. * * * The result was known to the Norman lawyers as frankpledge, and lords who owned hundred courts had also the right (which nor-

mally belonged to the sheriff) of verifying the proper enrollment of every tenant in a frankpledge. This was called 'view of frankpledge.' " Plucknett, History of Common Law (1st Ed.), p. 91.

"In 1264 Simon de Montfort appointed custodians of the peace; and the institution was continued after the close of the civil war." 1 Holdsworth, History of English Law (1st Ed.), p. 287.

By the close of the reign of Edward II, the business of the conservator was taking the form it was to assume in the hands of the justice of the peace under Edward III. 1 Holdsworth, History of English Law (1st Ed.), p. 287.

"Certain of the landed gentry were from time to time appointed in the interests of the public safety to be 'conservators of the peace.' They were at first chosen by the freeholders of the county, but after 1327 by the crown. Then, in 1360, 'justices of the peace' were appointed by the king for each county." 2 Odgers, The Common Law of England (2d Ed.), p. 973.

All men, in what Blackstone called a tithing, "were sureties or free pledges to the king for the good behaviour of each other and, if any offence was committed in their district, they were bound to have the offender forthcoming." 1 Cooley's Blackstone (1st Ed.), p. 112. This system was called frankpledge by the Normans, and the Mirror of the Justices contains a chapter devoted to the "View of Frankpledge" (7 Selden Society Publications, p. 39). Ten tithings constituted a hundred, called in the northern counties a wapentake. 1 Cooley's Blackstone (1st Ed.), p. 114. Tithing men, supposed to have been named from the most discreet of the men constituting the tithing, represented the tithing in the court of the

hundred. These tithing men were conservators of
the peace. They were chosen by the freeholders of
the county. But after 1327 they were chosen by the
crown. At this time, jury trial in the modern sense
of the term was unknown. It dates from the assize
of Clarendon in 1166. In 1215, the Lateran council
abolished trial by ordeal, and then those suspected
of criminal offenses were presented and tried by 12
knights of the shire and four men from each town-
ship, and this continued until 1352. Even at that
time it was regarded as somewhat anomalous that
the accusers should also be triers of offenses, and,
in 1352, by statute, the "jury of deliverance" was
ordained to be established. The old system of ac-
cusers by 12 knights and four men from each town-
ship is the probable historical origin of the grand
jury, while the statute of 1352 providing for a jury
of deliverance is the predecessor of the modern petit
jury. Hammond, Legal History (1st Ed.), pp. 5, 6.

Up to this time, justices of the peace were un-
known. In the view of frankpledge, according to the
Mirror, all persons were compelled to be present. By
statute of 54° Henry III, cap. 10, it is provided:

"Concerning the turns of sheriffs, it is provided,
that archbishops, bishops, abbots, priors, earls,
barons, or any men of religion, or women, shall not
need to come thither, except their appearance be es-
pecially required thereat for some other cause; but
the turn shall be kept as it hath been used in the times
of the king's noble progenitors. And if any have
tenements in different hundreds, they shall not be
bound to appear at any such turns, but in the baili-
wicks where they be dwelling. And the turns shall
be kept after the form of the great charter, and as
they were used to be kept in the times of King
*Richard* and King *John.*" 1 English Statutes-at-
Large, p. 63.

Justices of the peace were not provided for until 34° Edward III, cap. 1, in 1360–1361, when it was provided:

"That in every county of England there shall be assigned for the keeping of the peace, one lord, and with him three or four of the most worthy of the counties, together with some learned in the law; and they shall have power," among other things, "to take of all them that be not of good fame, where they shall be found, sufficient surety and mainprise for their good behaviour toward the king and his people, * * * to the intent that the people be not by such riotors troubled nor endamaged, nor the peace blemished, nor merchants nor others passing by the highways of the realm disturbed, nor beset by the peril which may happen of such offenders." 1 English Statutes-at-Large, pp. 664, 665.

The common law was brought to this country by the English colonists who settled at Jamestown in 1607. What was brought was not only the common customary law of England, but the law as modified by English statutes of general operation up to that time, subject to some modifications not here important. *Penny* v. *Little,* 3 Scam. (4 Ill.) 301; *Crake* v. *Crake,* 18 Ind. 156; *Lavalle* v. *Strobel,* 89 Ill. 370; 1 Kent's Commentaries (14th Ed.), pp. 472, 473; 1 Select Essays in Anglo-American Legal History (1st Ed.), pp. 367–430.

The ordinances of 1787, for the government of the territory northwest of the Ohio river, provided the inhabitants of the territory should always be entitled to judicial proceedings according to the course of the common law. *Swan* v. *Williams,* 2 Mich. 427. The common law, including the English statutes of general application, made the law of the Northwest Territory by the ordinance of 1787, continued to be the law of Michigan during the territorial period. *Mer-*

*cer* v. *Williams,* Walk. Ch. (Mich.) 85; *Stout* v. *Keyes,* 2 Doug. (Mich.) 184 (43 Am. Dec. 465); *May* v. *Rumney,* 1 Mich. 1; *Lorman* v. *Benson,* 8 Mich. 18 (77 Am. Dec. 435); *Crane* v. *Reeder,* 21 Mich. 24 (4 Am. Rep. 430). August 23, 1788, the governor and judges of the Northwest Territory provided for justices of the peace, ''and the said justices, and each and every of them, shall have power and authority in and out of sessions, to take all manner of recognizances, with or without surety, for good behaviour, to keep the peace.'' Pease, Laws of Northwest Territory (1st Ed.), pp. 4, 5.

By legislative act of the governor and judges of Indiana Territory, January 23, 1801, justices of the peace were authorized to take all manner of recognizances, and ''all recognizances for the peace, behavior,'' et cetera. Philbrick, 2 Laws of Indiana Territory (1801–1809), p. 8.

By act of the governor and judges of Michigan Territory, November 4, 1815, § 62, if any person was convicted of any offense against the Territory, not punishable by death, ''it shall be lawful for the court before whom any such conviction shall be had, to order, beside the punishment prescribed by law, that such offender shall find surety to keep the peace or be of good behaviour, or both, in such sum, for such time, and in such number and sufficiency, as they shall judge proper'' (1 Territorial Laws, p. 133). By legislative act of the governor and judges of Michigan Territory, May 17, 1820, § 65, the same provision was continued in force (1 Territorial Laws, p. 588).

By act of the legislative council of the Territory of Michigan, April 12, 1827, § 1, it was provided that all justices of the peace in their respective counties shall, jointly and severally therein, cause to be kept all laws made for the preservation and good of the

peace, "and also to cause to come before them all persons who shall threaten to break the peace, or who be not of good fame, to find security for the peace, or for their good behaviour, or both, as the case may require; and if they refuse to find such security, to commit them to prison until they shall find the same" (2 Territorial Laws, pp. 459, 460).

By act of the legislative council of the Territory of Michigan, April 22, 1833, § 8, "Every judge of the peace or circuit court throughout the Territory, and every justice of the county court throughout his county, shall have the same authority to keep the peace, to inquire into all breaches thereof, and to commit, let to bail, or discharge all persons who shall break the same, as is herein granted to justices of the peace, and shall proceed in all respects in the same manner." And by section 1 of the same act, all justices of the peace in their respective counties are authorized "to cause to come before them all persons who shall threaten to break the peace, or who be not of good fame, to find security for the peace, or for their good behavior, or both, as the case may require; and if they refuse to find such security, to commit them to prison until they shall find the same" (3 Territorial Laws, pp. 1142, 1144).

The statutes of this State provide:

"The justices of the Supreme Court, the several circuit judges, judges of courts of record having jurisdiction of criminal causes, circuit court commissioners, all mayors and recorders of cities, and all justices of the peace, shall have power to cause all the laws made for the preservation of the public peace to be kept and in the execution of this power may require persons to give security to keep the peace in the manner provided in this chapter." 3 Comp. Laws 1929, § 17388 (Stat. Ann. § 28.1154).

The succeeding sections of the chapter provide— whenever complaint shall be made in writing, on

oath, before any such magistrate, it shall be the duty of such magistrate to examine the witnesses who may be produced, on oath, and reduce the examination to writing, 3 Comp. Laws 1929, § 17389 (Stat. Ann. § 28.1155); to issue a warrant, directed to the sheriff or any constable of the county, for the arrest of the accused, 3 Comp. Laws 1929, § 17390 (Stat. Ann. § 28.1156); when the party complained of is brought before the magistrate, he may demand a trial either before the magistrate or by jury, in accordance with the usual procedure in criminal cases, and if the accused shall be found guilty, "the magistrate may require the accused to enter into a recognizance, with sufficient sureties, to be approved by such magistrate, in such sum as he shall direct, to keep the peace towards all the people of this State, and especially towards the person requiring such sureties, for such term as he may order not exceeding two years" 3 Comp. Laws 1929, § 17391 (Stat. Ann. § 28.1157); upon complying with the order of the magistrate, the party complained of shall be discharged, 3 Comp. Laws 1929, § 17392 (Stat. Ann. § 28.1158); "If the person so ordered to recognize shall refuse or neglect to comply with such order, the magistrate shall commit him to the county jail during the period for which he was required to give security, or until he shall so recognize, stating in the warrant the cause of commitment with the sum and the time for which such security was required" 3 Comp. Laws 1929, § 17393 (Stat. Ann. § 28.1159); any person aggrieved by the order of any justice of the peace, requiring him to recognize as aforesaid, may, on giving the recognizance to keep the peace required by such order, appeal to the circuit court for the same county, 3 Comp. Laws 1929, § 17396 (Stat. Ann. § 28.1162), and upon appeal the accused may be required to enter into a new recognizance with sufficient sureties, in such sum and for such time, not exceeding two

years, as the court shall think proper, 3 Comp. Laws 1920, § 17397 (Stat. Ann. § 28.1163).

3 Comp. Laws 1929, § 17388 (Stat. Ann. § 28.1154), above quoted, first made its appearance as Revised Statutes 1846, chap. 162, § 1. It then provided:

"The justices of the Supreme Court, judges of county courts, circuit court commissioners, all mayors and recorders of cities, and all justices of the peace, shall have power to cause all laws made for the preservation of the public peace, to be kept, and in the execution of that power, may require persons to give security to keep the peace, in the manner provided in this chapter."

County courts were abolished by the Constitution of 1850 (art. 6). An independent Supreme Court was created in 1857 and went into operation January 1, 1858.

Act No. 4, Pub. Acts 1858, purported to amend the Revised Statutes of 1846 and other statutes so as to adapt them to the organization of the present Supreme Court, et cetera. By that act, R. S. 1846, chap. 162, § 1, was amended, and the statute as thus amended still stands. R. S. 1846, chap. 162, § 1, was not amended by the Constitution of 1850, nor was that statute, as amended by Act No. 4, Pub. Acts 1858, affected by the Constitution of 1908. The Constitution of 1850, art. 6, § 19, was identical with the Constitution of 1908, art. 7, § 18, above quoted. If a statutory or constitutional limitation upon the powers of conservators of the peace as fixed by statute was desired, there has been ample opportunity to impose it since the statute was enacted.

The proceedings to commit defendant are regular, the justice acted within the terms of the statute and did not exceed his jurisdiction. The statute is not unconstitutional but authorized by Constitution of 1908, art. 7, § 18, which, construed in the light of the

common law and the practice under the prior statutes in force in Michigan, warranted his action. The proceedings taken were to prevent crime and were not invalid.

The application will be dismissed.

BUTZEL, C. J., BUSHNELL, SHARPE, CHANDLER, and McALLISTER, JJ., concurred with POTTER, J. NORTH, J., concurred in the result.

WIEST, J. (*concurring*). I concur in the result, being content with the mentioned statutes on the subject.